**Theodore Patrick MILAS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–331 C.

United States Court of Federal Claims.

Jan. 20, 1999.

---

John B. Wells, Slidell, LA, for plaintiff.

F. Jefferson Hughes, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director James M. Kinsella, for defendant. Lieutenant Michael Shane, Department of the Navy, of counsel.

## ORDER

MOODY R. TIDWELL, III, Senior Judge.

Plaintiff Theodore Patrick Milas was administratively discharged from the United States Navy for sexually abusing his son. After seeking relief at the Board for Correction of Naval Records (BCNR), plaintiff filed a complaint in this court seeking reinstatement with full pay and benefits. The case is now before the court on cross-motions for judgment on the administrative record.

## BACKGROUND

In 1966, plaintiff became an ordained minister and married his first wife, Cordelia. Plaintiff was commissioned as a reserve officer in the Chaplain Corps of the Naval Reserve in October 1973. In 1975, plaintiff divorced Cordelia and married his second wife, Shirley Ann Herold (Shirley), who had four children. In 1983, plaintiff and Shirley were divorced after a bitter court battle. No allegations of physical or sexual abuse were raised during the course of the divorce. By September 1982, plaintiff had been promoted to Lieutenant Commander and entered the Regular Navy. Plaintiff married his third wife, Mary, on February 17, 1983. In October 1983, Mary gave birth to plaintiff's son, Theodore Patrick, Jr. (Patrick). In August 1986, plaintiff was promoted to Commander.

On February 24, 1990, plaintiff allegedly struck and tried to choke six-year-old Patrick. Mary took Patrick and moved out of the house that same day. Maryland State Police investigated the incident and concluded that the alleged physical abuse was unfounded and fell "within acceptable corporal punishment." On May 18, 1990, St. Mary's County contacted the Family Support Program of the National Naval Medical Center (NNMC) and notified the military that it was investigating plaintiff. Dr. Sandra Rosswork, plaintiff's civilian supervisor, took over as case manager.

Patrick had been receiving psychological counseling from Dr. Mary McCloy, and on May 22, 1990, Patrick told Dr. McCloy that plaintiff had "put soap in my [anus]" and "Daddy always did this." The following day, Mary took Patrick to Dr. Barbara DeFrancesca, a civilian pediatrician, for documentation of physical or sexual abuse. When asked if plaintiff hurt Patrick in any way other than striking him in February 1990, Patrick answered "yes, with the soap, he put the soap in my [anus]." On further questioning, Patrick said that plaintiff would shower with Patrick every night and insert a bar of soap into him, then apply cream to his anus. Patrick said plaintiff's penis was always erect during the showers. He added that plaintiff was always asking him to sit on plaintiff's pelvic region and plaintiff would be "jiggling a lot" until plaintiff told Patrick to get off. The doctor opined that Patrick's responses did not appear coached. Examination found normal anal tone, but observed some redness. The doctor recommended that the

case be considered "suspected child/sexual abuse" and on May 23, 1990, she reported the alleged sexual abuse to NNMC.

The Naval Investigative Service (NIS) began investigating the allegations immediately. By May 25, 1990, Mary had provided a written statement that she had "never observed any physical or sexual abuse of my son, Patrick." She said she first became aware that plaintiff was sexually abusing Patrick when Dr. McCloy told her about Patrick's complaints, but noted that in January 1989 she had once heard Patrick scream while plaintiff and Patrick were showering together. When she asked what was the matter, plaintiff had replied that he was cleaning Patrick's anus. "That night I had a conversation with [plaintiff] concerning his obsession with Patrick's [anus] and always checkking [sic] it and applying medication/ointment and wiping it," she said.

By June 5, 1990, a detective from the Charles County Sheriff's office had investigated the sexual abuse charge and closed the file as unfounded. Meanwhile, NIS continued its investigation. On June 8, 1990, NIS searched Mary's home for pornographic materials depicting anal sex allegedly kept by plaintiff. None were found. That same day, NIS special agent Theresa Bland interviewed Patrick at his home. Patrick said plaintiff would put a bar of soap in his rectum during nightly showers together, and said plaintiff's penis was "hard" at the time. About four times a week, once they were done showering, Patrick would lay face down on plaintiff's bed with his " 'butt' in the air" while plaintiff "put the ointment in him."

In July 1990 Patrick underwent a medical examination at the request of NIS. The physician found no anal scarring, but stated that this did not rule out sexual abuse. On July 2, 1990, Nancy Wolfe of Maryland Child Protective Services opined that based upon interviews with plaintiff, Patrick, and Mary, "sexual abuse has occurred."

In August 1990, Cheryl Crook, Shirley's oldest daughter, provided NIS a written statement alleging in detail that plaintiff sexually abused her several times a week over a period of about three years. All of Shirley's children stated that plaintiff had physically abused them and their mother.

On October 30, 1990, NIS interviewed plaintiff, who followed the legal advice of his attorney and declined to discuss the allegations that he had put soap in Patrick's anus. He said he did take showers with Patrick, but not all the time, and he only bathed Patrick if he "had poo on his rear end." He also denied sexually abusing Cheryl.

In November 1990, the child subcommittee of the NNMC Family Advocacy Program determined that there was substantiated child sexual and physical abuse. On December 20, 1990, a Board of Officers reviewed the allegations of misconduct and concluded that there was sufficient evidence to require plaintiff to show cause before a Board of Inquiry why he should be retained as an officer. Six days later, plaintiff was arrested by Charles County Police. A six-count criminal information was filed in Charles County, Maryland, on February 7, 1991, alleging sexual and physical abuse.

In preparation for his defense, plaintiff took a privately administered polygraph test on February 26, 1991. The results indicated that plaintiff "did not attempt deception" when he answered the following two questions in the negative: (1) "On 24 February 1990, did you choke Patrick?" and (2) "Did you ever put soap in Patrick's anus for sexual gratification."

On February 26, 1991, the Commander of NMPC appointed Captain F.L. Bowman, Captain H.W. Nesbitt, and Captain J.R. McNeil, to serve on the Board of Inquiry. A hearing was held from March 12–15, 1991, and plaintiff was represented by both military and civilian counsel. At the hearing, Dr. Davis testified that she had interviewed Patrick and, using anatomically correct dolls, Patrick had asked for an object he called a bar of soap, placed it in the adult doll's hand, and inserted it in the child doll's anus. Dr. Davis said she believed Patrick's testimony and opined that he had not been coached because, inter alia, he "was not in any [way] willing to change his story" despite her attempts to confuse him.

Shirley testified that during their marriage plaintiff had physically abused her and her children, had numerous adulterous affairs, and sexually abused Cheryl. Plaintiff's counsel objected to this testimony because the subject matter predated plaintiff's entry into the military. Shirley's daughter Cheryl also testified, alleging in graphic detail how plaintiff had molested her from the time she was ten years old until she was fourteen. Cheryl also testified that plaintiff beat her and her mother and siblings.

After the government's case in chief was closed, plaintiff's counsel announced that Mary Milas had decided not to testify even though the government had identified her as a witness and had encouraged her to appear. Plaintiff's counsel also noted that Mary could not be compelled to testify because the Board of Inquiry lacked subpoena power.

Plaintiff called numerous defense witnesses who testified of his good character. They described him as kind, dependable, incapable of hurting others, absolutely honest, credible, a superlative chaplain, and an officer capable of continued honorable service as a chaplain in the Navy. Some volunteered that they would trust plaintiff with their own children.

Plaintiff elected to offer an unsworn statement because civilian criminal charges were pending at the time and his civilian attorney had advised him not to make a sworn statement prior to the criminal action.[1] Plaintiff said that at times Patrick's rear end was irritated because Patrick had not wiped himself properly and Patrick did not want to clean himself because it hurt. Plaintiff said he would take a bar of soap and rub it between Patrick's buttocks then rinse the soap away. Plaintiff said he only applied ointment to the sides of the buttocks on an "as needed" basis when they were red. Plaintiff denied having an erection in front of Patrick at any time, and he flatly denied engaging in any sexual activity with any of Shirley's children.

In rebuttal, the government called Rear Admiral Roberta Hazard (RADM Hazard). RADM Hazard gave her opinion that "if the charges are true there is no place for Chaplain Milas in the naval service." She also stated that "even if he is found not guilty of the charges as brought, ... he may lack within his own community ... some of the credibility that is particularly desirous in a chaplain," and added that she would have "some trepidations with regard to the degree to which the individual who is a chaplain could successfully execute his or her role after the Board of Inquiry found him or her not guilty." However, she later clarified her statement by explaining that she would not ask the Board of Inquiry to separate him from the service regardless of its findings about the underlying abuse. RADM Hazard also stated that Admiral Boorda would make the final decision on appropriate disciplinary action.

Dr. Sandra Rosswork, a psychologist and the Family Advocacy Program manager and plaintiff's superior, explained that the Navy can choose between separating or attempting to treat a sex offender. Dr. Rosswork clearly acknowledged that even though separation processing is mandatory for enlisted personnel who committed serious sexual perversion, it is not mandatory for officers. In this case, Dr. Rosswork said she and two case managers had reviewed the subcommittee's recommendation and decided that plaintiff was not eligible for the treatment option. Captain Urice, plaintiff's commanding officer, signed the recommendation.

On March 15, 1991, the Board of Inquiry unanimously concluded that plaintiff had not assaulted his son, but did find that he had committed indecent and perverted acts by inserting soap and ointment into Patrick's anus with intent to arouse and gratify his lust and sexual desires, that he engaged in conduct unbecoming an officer by sexually abusing his son, and that he had failed to demonstrate the acceptable leadership and conduct required of an officer of his grade. The Board of Inquiry recommended an Other Than Honorable discharge, and expressly stated that "any evidence of preservice misconduct, and/or evidence of misconduct iden-

---

1. Unsworn statements are not subject to cross-examination or examination by the Board of Inquiry members. *See* SECNAVINST 1920.6A, enclosure 8, ¶ (B)(6)(j) (April 17, 1984).

tified more than five years prior to the initiation of processing for separation was not used in determining the recommendation for characterization of service."

On July 17, 1991, the jury in the civilian criminal trial conducted in the Charles County Circuit Court acquitted plaintiff on all counts of alleged physical and sexual abuse against Patrick.

On August 27, 1991, a Board of Review met and issued a report unanimously sustaining the Board of Inquiry's findings that plaintiff should be separated for indecent acts with a child, conduct unbecoming an officer, sexual perversion, and substandard performance of duty. The Assistant Secretary of the Navy (Manpower and Reserve Affairs) recommended on April 30, 1992, that plaintiff be discharged under other than honorable conditions. On May 11, 1992, plaintiff asked the Assistant Secretary of the Navy to reconsider her decision. She denied the request the same day. On May 13, 1992, plaintiff was discharged under conditions other than honorable for commission of a serious offense.

Plaintiff petitioned the Board for Correction of Naval Records (BCNR) on March 3, 1994, requesting that his administrative separation be set aside, that he be restored to duty, and that all references to sexual abuse in his records be expunged. The BCNR convened an executive session on November 15, 1994. The BCNR refused to grant the relief sought, concluding that the evidence relied upon below had been properly presented and there was a preponderance of evidence that plaintiff had sexually molested his son.

On April 13, 1998, plaintiff filed his complaint in this court asserting three causes of action. First, plaintiff alleges violation of the Fifth Amendment's right to due process. The second cause of action claims that the BCNR failed to correct plaintiff's record despite substantial evidence that plaintiff did not commit the alleged misconduct. Third, plaintiff complains that his Sixth Amendment rights to compulsory process, confrontation, and cross-examination were violated. The United States filed the Defendant's Motion for Judgment Upon the Administrative Rec-

ord on July 27, 1998. Plaintiff responded on September 21, 1998, with Plaintiff's Opposition to Defendant's Motion for Judgement on the Administrative Record and Cross Motion for Judgement on the Administrative Record.

## DISCUSSION

■ Motions for judgment on the administrative record are reviewed under the same standards as motions for summary judgment. *See* RCFC 56.1(a); *Hoskins v. United States*, 40 Fed.Cl. 259, 270 (1998). Consequently, judgment on such motions is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505. In this case, the parties do not attempt to demonstrate any genuine disputes over material facts, and the court finds that none exist. Therefore, the court turns to the issues of law.

### A. Jurisdiction

It has long been established that a court created by statute has no jurisdiction except that which is conferred by statute. *See Boddie–Noell Enters. v. United States*, 36 Fed. Cl. 722, 728 (1996), *aff'd*, 132 F.3d 54 (Fed. Cir.1997). Therefore, as an Article I court created by Congress, *see Slovacek v. United States*, 40 Fed.Cl. 828, 833 (1998), the Court of Federal Claims cannot exercise its limited jurisdiction beyond that which Congress has provided.

In section 1491 of Title 28 (Tucker Act), the court is granted "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491(a)(1) (1994). The court is also granted jurisdiction to "provide an entire remedy and to complete the relief afforded by the judgment" rendered pursuant to § 1491(a)(1), including the power to "is-

sue orders directing restoration to office or position ... and correction of applicable records." 28 U.S.C. § 1491(a)(2) (1994). However, "[n]ot every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States." *United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

■ In this case, plaintiff relies upon 37 U.S.C. § 204 as the statutory basis for money damages. "It is well established that 37 U.S.C. § 204 ('Pay and Allowances of the Uniformed Services') serves as the money-mandating statute applicable to military personnel claiming damages and ancillary relief for wrongful discharge." *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.1997). Therefore, "[p]ursuant to 28 U.S.C. § 1491(a)(2) and 37 U.S.C. § 204, a service member may file a complaint in the Court of Federal Claims for back pay on the basis that he has been unlawfully discharged." *Kindred v. United States,* 41 Fed.Cl. 106, 111 (1998).

If plaintiff had asserted his first and third causes of action exclusively on the basis that the constitution had been violated, the court would be required to dismiss those claims because the Fifth and Sixth Amendments are not money mandating and, consequently, cannot combine with the Tucker Act to provide the court jurisdiction. *See Black v. United States,* 28 Fed.Cl. 177, 186, *aff'd,* 16 F.3d 421 (Fed.Cir.1993) ("Although plaintiff seeks money damages against the United States based on statutory grounds, the Due Process Clause does not provide an additional cause of action," hence no jurisdiction over claimed violation of "due process right to cross-examine and confront adverse witnesses"); *Yount v. United States,* 23 Cl.Ct. 372, 379 n. 8 (1991), *aff'd,* 985 F.2d 583 (Fed.Cir.1992) ("it is well established that the court lacks jurisdiction to consider due process claims based on the fifth or fourteenth amendments").

The court finds that plaintiff's first and third claims are not based solely upon the constitutional amendments. In his cross-motion, plaintiff cites 37 U.S.C. § 204 as statutory authority mandating money damages for wrongful termination from the military. Therefore, the court derives jurisdiction from the money-mandating statute and the alleged constitutional violations constitute "a factor in the claim for which Tucker Act jurisdiction is established." *Holley,* 124 F.3d at 1466. Consequently, the court may "consider[ ] the constitutional issue[s] in the course of determining whether the discharge was wrongful." *Id.; see also Cameron v. United States,* 34 Fed.Cl. 422, 426–27 n. 10 (1995) ("the pay statutes are the only necessary requisite to jurisdiction. Once jurisdiction attaches, the serviceman can argue that his deprivation of pay was improper for various reasons, including an infringement of constitutional rights").

**B. Scope of Review**

■ A naval officer may obtain review of an administrative discharge by proceeding directly to the Court of Federal Claims, or the officer may petition the BCNR for relief before filing suit in this court. *See, e.g., Kindred,* 41 Fed.Cl. at 109 & n. 1. "An appeal to a board for the correction of military records is not a statutorily mandated prerequisite to federal court jurisdiction." *Gallucci v. United States,* 41 Fed.Cl. 631, 644 (1998). The decision to pursue a remedy before the BCNR provides the claimant an extra level of review, but

> [l]egal precedent dictates that it is inappropriate for this court to review on appeal[ ] new issues which should have been brought to the attention of the administrative agency competent to hear it, in this case, the BCNR. A party is not entitled to many independent chances to prevail, and his voluntary choice [to appeal to the BCNR] determines the extent of the court's review.
>
> ... Allowing a party to withhold important issues from the board and later present them to this court is impermissible.

*Id.* (citations omitted); *see also Moyer v. United States,* 41 Fed.Cl. 324, 328 (1998) (failure to raise argument at board of corrections waived the claim because officer "was obligated to raise before the [board of corrections] any known objections ... that he wished to preserve for judicial review in this court"); *Doyle v. United States,* 220 Ct.Cl.

285, 599 F.2d 984, 1000–01 (Ct.Cl.) (plaintiff's voluntary choice often determines extent of court review; known objections must be made to agency to afford opportunity to correct errors at administrative level), *amended on other grounds by In re Doyle*, 220 Ct.Cl. 326, 609 F.2d 990 (Ct.Cl.1979). Therefore, the court will consider only those issues raised by plaintiff before the BCNR.

■ In order for the issue to have been "raised," plaintiff must have given the BCNR a reasonable opportunity to identify and address the alleged error. The court reads objections made before the BCNR broadly, but "plaintiffs are required to voice their objections in such a way that the Secretary or Correction Board is aware of [the] problems." *Doyle*, 599 F.2d at 1001. An argument which "addresse[s] the same general theme" but is based on a different legal theory is not sufficient. *See Moyer*, 41 Fed. Cl. at 328 & n. 3.

Several of plaintiff's arguments are not properly before the court because they raise procedural issues which were not raised before the BCNR. For example, plaintiff argues for the first time that the government violated NAVMEDCOMINST 6320.22(i)(11) (Jan. 19, 1989), which directs the Family Advocacy Representative to ensure that an alleged offender is "apprised of the implications of FAP [Family Advocacy Program] involvement and is given the opportunity to give information to the CRS (Case Review Subcommittee)." In his petition to the BCNR, plaintiff mentioned the child subcommittee as a step in the procedural history of the case, but nowhere in the petition or any of the twenty documents appended to the BCNR petition did plaintiff complain that he had been denied notice and an opportunity to submit information. Because the BCNR was not made aware of the alleged error, the issue "was not ventilated administratively before the BCNR," *Laningham v. United States*, 30 Fed.Cl. 296, 315 (1994), and the agency was left without "an opportunity to make adjustments and correct errors on the administrative level, thus permitting the government to mitigate or avoid large damage claims that might otherwise be created." *Doyle*, 599 F.2d at 1001 (citations and quota-

tion marks omitted). Therefore, "this claim may not be raised for the first time in this court." *See Laningham*, 30 Fed.Cl. at 315.

Plaintiff also argues for the first time that the case review subcommittee procedures violate due process because plaintiff was "tried and found guilty" by the subcommittee without being given the constitutionally required notice and hearing. Having failed to raise this issue before the agency, he may not raise it here for the first time. *See id.* However, even if the court were authorized to consider this argument, the court would find it meritless.

Plaintiff asserts that the case review subcommittee took away both a property interest and a liberty interest without providing him due process. In *Canonica v. United States*, 41 Fed.Cl. 516 (1998), the court recently reviewed the due process rights of military personnel:

> Persons are entitled to due process before they can be deprived of property or liberty. Courts have held that an enlisted member of the armed forces does not have a property interest in his employment because he may be discharged "as prescribed by the Secretary" of his service. However, courts have held that an enlisted member of the armed forces has a liberty interest in his employment.

> This liberty interest prevents the military from discharging a service member without due process—but only in cases where a "stigma" would attach to the discharge.

*Id.* at 524 (citations omitted). These principles also apply to officers. *Compare Paskert v. United States*, 20 Cl.Ct. 65, 77 (1990) (case involving discharged Army captain; court held that "[s]ervice members have no constitutional rights to remain on active duty, and their rights are defined by the applicable statutes").

Because plaintiff had no property interest in his employment, he had no right to due process to protect that nonexistent interest when his case was being considered by the subcommittee. Therefore, plaintiff's reliance on the theory that he lost a property interest is misplaced.

Plaintiff's argument that the subcommittee procedures violated due process by infringing on a liberty interest is also without merit. It is true that military personnel possess a liberty interest in avoiding the self-evident stigma which accompanies discharge for sexual abuse. *See Canonica,* 41 Fed.Cl. at 524. Plaintiff was, therefore, entitled to constitutional due process. *See id.* However, this does not mean that plaintiff was entitled to a full evidentiary hearing at the case review subcommittee level. Even assuming that the stigma did attach to plaintiff during proceedings before the subcommittee, "due process rights are typically fulfilled by notice of the government act and an opportunity to respond *before or after the act.*" *Canonica,* 41 Fed.Cl. at 524 (emphasis added). In this case, plaintiff was given notice and an evidentiary hearing during proceedings before the Board of Inquiry. Therefore, the requirements of due process were satisfied.

## C. Standard of Review

■ In addition to limiting the scope of review, plaintiff's decision to petition the BCNR before seeking relief from this court also affects the standard of review.

> Once a plaintiff has sought relief from a correction board, ... the plaintiff is bound by that board's determination unless he can satisfy the difficult standard of proof that the correction board's decision was illegal because it was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, or money is due.

*Hoskins v. United States,* 40 Fed.Cl. 259, 271–72 (1998) (quoting *Palmer v. United States,* 38 Fed.Cl. 316, 324 (1997)); *see also Gallucci,* 41 Fed.Cl. at 643. Great deference is afforded the BCNR's decisions because "Congress has entrusted the primary duty of correcting military records to the correction boards." *Hoffman v. United States,* 16 Cl.Ct.

406, 408 (1989) (*Hoffman I*), *aff'd* 894 F.2d 380 (Fed.Cir.1990) (*Hoffman II*).

■ Mere technical procedural error is insufficient to warrant reversing the agency's administrative decision. The error must be a violation of "mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced." *Gallucci,* 41 Fed.Cl. at 643 (citation omitted); *Krauss v. United States,* 40 Fed.Cl. 834, 838 (1998) (quoting *Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 811 (1979)); *Hoskins,* 40 Fed.Cl. at 271–72 (quoting *Palmer,* 38 Fed. Cl. at 324); *compare Porter v. United States,* 163 F.3d 1304, 1319 (Fed.Cir.1998) (surveying earlier case law and concluding that "[i]nstances of fundamental error ... are not susceptible to review under the harmless error test" and require an appropriate remedy, but non-fundamental procedural defects are subject to the "but for" or "harmless error" tests). The heavy burden of demonstrating clear and convincing evidence that the BCNR erred rests on the plaintiff. *See Gallucci,* 41 Fed.Cl. at 643; *see also Doe v. United States,* 132 F.3d 1430, 1434 (Fed.Cir. 1997).

## D. Improper Command Influence

■ Plaintiff alleges that RADM Hazard and Dr. Rosswork exerted improper command influence over the Board of Inquiry and Board of Review in violation of 10 U.S.C. § 837 (1994).[2] In order for plaintiff to establish unlawful command influence, he must show (1) a command relationship, (2) improper influence by virtue of that relationship, and (3) a nexus between the alleged influence and plaintiff's dismissal. *See Werking v. United States,* 4 Cl.Ct. 101, 105 (1983). Plaintiff's accusations of improper command influence are without merit because plaintiff does not show a command relationship by which either RADM Hazard or Dr. Rosswork might have been able to manipulate the administrative proceedings.

---

**2.** Section 837(a) states, in pertinent part:

No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

10 U.S.C. § 837(a).

## 1. RADM Hazard

Plaintiff does not suggest that any of the board members fell under the command of RADM Hazard. Instead, plaintiff weakly argues that RADM Hazard worked for Admiral Boorda, and the members of the Board of Inquiry and the Board of Review were on Admiral Boorda's staff. The fact that the board members and RADM Hazard share a common superior officer is not sufficient on its own to demonstrate a command relationship. *See Hoffman II*, 894 F.2d at 384 (colonel reporting to brigadier general was not in same chain of command as a captain who reported to same brigadier general through different colonels).

Plaintiff also argues that RADM Hazard exerted improper command influence by pressuring the Board of Review, which "merely performed a perfunctory cursory review." This allegation is unsubstantiated by any evidence to support the existence of a command relationship between the Board of Review members and RADM Hazard. Furthermore, plaintiff provides no evidence to support the accusation that RADM Hazard communicated her alleged desires to the Board of Review in any improper way, and fails to prove that the allegedly insufficient review seriously prejudiced him. *See* discussion *infra* at I (Board of Review did not fail to fulfill its duties).

Plaintiff also attempts to demonstrate command influence by attributing RADM Hazard's testimony to Admiral Boorda. Plaintiff argues that the members of the boards of inquiry and review "could have reasonably inferred that she [RADM Hazard] was speaking with the approval and consent of the Chief of Naval Personnel, Admiral Boorda." However, nothing in the record substantiates plaintiff's assertion. Therefore, plaintiff's conclusion that RADM Hazard exerted improper command influence "rests upon hypothetical speculation and conjecture," and the court has "no basis for rejecting the decision of the Correction Board that [plaintiff] had not established a basis for

correction of his military records." *Hoffman II*, 894 F.2d at 385.

## 2. Dr. Rosswork

Plaintiff's contention that Dr. Rosswork, a civilian, exerted improper command influence is also without merit. Plaintiff suggests that Dr. Rosswork's involvement in the case and her testimony before the Board of Inquiry "should be imputed to her boss, RADM Hazard and to the Chief of Naval Personnel," but plaintiff gives no reason why. These bare accusations, which rely on the already rejected suggestion that RADM Hazard's conduct should, without supporting evidence, be imputed to Admiral Boorda, also fail to demonstrate improper command influence.[3]

## E. Acquittal by a Civilian Criminal Court

Plaintiff argues that his acquittal in state court required the BCNR to correct his military record under the doctrine of collateral estoppel. "The principle of collateral estoppel dictates that an issue that is fully and fairly litigated, is determined by a final judgment, and is essential to that judgment, is conclusive in a subsequent action between the same parties." *Bingaman v. Dep't of the Treasury*, 127 F.3d 1431, 1436–37 (Fed.Cir. 1997). Because plaintiff does not satisfy all of these elements, his reliance on this doctrine is misplaced.

The issue of plaintiff's misconduct for purposes of administrative discharge was not fully and fairly litigated in Maryland criminal court because the state court considered different issues. To be convicted of criminal child abuse under Maryland law, plaintiff had to be found guilty beyond a reasonable doubt. *See Wills v. State*, 329 Md. 370, 620 A.2d 295, 297 (Md.1993) ("We have been taught by the Supreme Court of the United States that the reasonable doubt standard is constitutionally mandated ... and is an indispensable component of every criminal proceeding"). In administrative discharge proceedings, by contrast, the Board of Inquiry is required only to find a preponderance of evidence that an officer should be discharged

---

3. Plaintiff also contends that Dr. Rosswork's testimony prejudiced plaintiff because the two had experienced "professional conflicts," but, again, plaintiff fails to support his argument with evidence to support his conclusory accusations.

for the misconduct charged. *See* SECNA-VINST 1920.6A, enclosure 8, ¶ B(11)(a) (Apr. 17, 1984).

Because the reasonable doubt standard is higher than the preponderating evidence standard, when a jury in a criminal case concludes that there is insufficient evidence to establish proof of guilt beyond a reasonable doubt, it does not necessarily follow that a preponderance of evidence was also lacking. Therefore, the issue of guilt by preponderating evidence was not an issue essential to the judgment of acquittal in Maryland court, and the doctrine of collateral estoppel cannot apply in this case.

Collateral estoppel is also unavailable to plaintiff because the federal government was not a party to the Maryland state prosecution. "Although collateral estoppel can be applied in some instances when the parties to the two proceedings in question differ, it is available against the government only when the parties to the two proceedings are the same." *Bingaman,* 127 F.3d at 1439. Consequently, the doctrine of collateral estoppel cannot foreclose the Navy's right to pursue administrative separation proceedings against plaintiff.[4]

## F. Polygraph Evidence

 In its decision, the BCNR noted that it "considered the exculpatory evidence introduced in [plaintiff's] behalf, especially the polygraph results and the testimony of the polygraph examiner at the board of inquiry. However, the [BCNR] is reluctant to give great weight to the results of a polygraph examination." The BCNR reasoned that Military Rule of Evidence 707 (Rule 707) prohibits the use of polygraph evidence in courts-martial because of the danger that the trier of fact will be misled; its use could distract attention from the facts of the case by focusing on the validity of polygraphs, the competence of the examiner, and the reliability of the particular test; and the value of polygraph evidence is questionable because its reliability has not been sufficiently established. Plaintiff argues that these statements show that the BCNR failed to

properly consider the exculpatory polygraph evidence. Plaintiff is wrong.

In *United States v. Scheffer,* 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), eight members of the Supreme Court recently concluded that "there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." *Id.,* 523 U.S. 303, 118 S.Ct. at 1265 (Part II–A of the opinion of the Court authored by Thomas, J., and joined by Rehnquist, C.J., Scalia, J., and Souter, J.); *id.,* 523 U.S. 303, 118 S.Ct. at 1269 (Kennedy, J., concurring in part with Parts I, II–A, and II–D of the opinion of the Court and concurring in the judgment, joined by O'Connor, J., Ginsburg, J., and Breyer, J.). The Court continued: "there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams." *Id.,* 523 U.S. 303, 118 S.Ct. at 1266 (Part II–A). In the end, the Court held that Rule 707, "a per se rule excluding all polygraph evidence," was "a rational and proportional means of advancing the legitimate interest in barring unreliable evidence." *Id.* (Part II–A).

The language of *Scheffer* justifies the BCNR's decision to discount the weight of plaintiff's polygraph examination because it squarely approves of the BCNR's reasoning that "the probative value of such [polygraph] evidence is questionable since the reliability of polygraph evidence has not been sufficiently established." Therefore, under *Scheffer,* the BCNR's decision to admit the polygraph evidence but discount its weight on the basis of questionable reliability was not error.

Plaintiff argues that *Scheffer* does not control this case because *Scheffer* postdates the BCNR's decision and the "reviewing court must look to the law in effect at the time of the ruling." This argument is erroneous. In *Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), the Supreme Court held:

4. Plaintiff's other arguments that the state acquittal should have foreclosed administrative discharge have been considered and found equally meritless.

When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

*Id.* at 97, 113 S.Ct. 2510. Consequently, this court must give *Scheffer* full retroactive effect, and must uphold the BCNR's finding that the unreliable polygraph evidence deserved little exculpatory weight.

## G. Limitations on Use of Conduct Prior to Service or More Than Five Years Old

### 1. Error Allegedly Committed by the Board of Inquiry

Plaintiff argues that proceedings before the Board of Inquiry were tainted by evidence of misconduct that occurred before plaintiff entered the military and misconduct that was more than five years old. Navy regulations state that "conduct *identified* more than five years prior to the initiation of processing for separation under paragraph 2 of this enclosure [5] shall not form the basis for processing under this enclosure." SECNAVINST 1920.6A, enclosure 4, ¶ 10(e) (Nov. 21 1983) (emphasis added).

In this case, the record indicates that all of the evidence of misconduct was discovered during investigations conducted after the alleged assault against Patrick on February 24, 1990. The Board of Inquiry convened approximately one year later in March 1991. Thus, plaintiff has not shown that the evidence of prior misconduct was *identified* more than five years prior to the initiation of discharge proceedings. Consequently, the evidence was admissible.

Furthermore, the evidence was only used for the limited purposes allowed by Navy regulations:

Whenever evidence of preservice misconduct is presented to a board, the board may consider it only for the purpose of deciding whether to recommend separation or retention of the respondent. Such evidence shall not be used in determining the recommendation for characterization of service. The board shall affirmatively state in its report that such evidence was considered only for purposes of determining whether it should recommend retention or separation of the officer.

SECNAVINST 1920.6A, enclosure 4, ¶ 10(d) (Nov. 21 1983). Plaintiff acknowledges that "the report of the board [of Inquiry] indicates that the evidence of pre-service misconduct was not used in determining the characterization of service." He complains, however, that a large proportion of evidence showed preservice abuse, and concludes that "the large quantity of the testimony would tend to negate [the Board's] statement."

■ Plaintiff's argument is wrong. The evidence of preservice misconduct could properly be used by the Board of Inquiry to decide whether plaintiff should be administratively discharged. Therefore, it was properly admitted. The court also finds that the evidence was properly used. This court presumes that " 'administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith.' " *Doe,* 132 F.3d at 1434 (quoting *Sanders,* 594 F.2d at 813). Plaintiff has failed to rebut this presumption with any evidence. Therefore, the court finds that the Board of Inquiry acted in accordance with its express statement that the evidence of preservice misconduct was not used improperly to characterize the nature of plaintiff's discharge.

### 2. Error Allegedly Committed by the BCNR

The BCNR found that evidence of preservice misconduct was properly considered by the Board of Inquiry. Plaintiff argues that the BCNR's reasoning was flawed because, if plaintiff had been prosecuted in a court martial, the Military Rules of Evidence would have excluded evidence of propensity to commit sexual abuse, including evidence of pre-

---

5. SECNAVINST 1920.6A, enclosure 4, ¶ 2 (Nov. 21, 1983) requires the Chief of Naval Personnel to initiate discharge proceedings against active duty officers whose record indicates that they should be required to show cause for retention because of misconduct.

service misconduct. He then argues that the BCNR relied on the Military Rules of Evidence to exclude exculpatory polygraph evidence, so fairness requires the BCNR to apply the Military Rules of Evidence to exclude "propensity evidence."

This argument is erroneous for several reasons. First, it is based on a misunderstanding of the BCNR's decision. The BCNR did not use the Military Rules of Evidence to justify *exclusion* of plaintiff's polygraph evidence—the polygraph evidence was admitted and considered by the Board of Inquiry and the BCNR. The BCNR cited Military Rule of Evidence 707 as persuasive authority that polygraph evidence was not reliable and should be afforded little *weight.* Thus, the BCNR did not selectively apply the Military Rules of Evidence to exclude exculpatory polygraph evidence while admitting inculpatory evidence of prior misconduct.

Plaintiff is also wrong because, as plaintiff acknowledges in his motion, the Military Rules of Evidence do not apply to administrative proceedings. *See* SECNAVINST 1920.6A, enclosure 8, ¶ B(10)(a) (Apr. 17, 1984). Consequently, "matter not admissible in a court of law may be accepted by Boards of Inquiry." SECNAVINST 1920.6A, enclosure 8, ¶ B(10)(b) (Apr. 17, 1984). Furthermore, the regulations allow the Board of Inquiry to consider evidence of prior misconduct for purposes of discharge. *See* SECNAVINST 1920.6A, enclosure 4, ¶ 10(d). Therefore, the BCNR did not err in allowing the Board of Inquiry to consider evidence of preservice misconduct.

## H. Right to Confront Witnesses

### 1. Sixth Amendment Rights to Confrontation, Cross-examination, and Compulsory Process

Plaintiff argues that his inability to examine Mary Milas at the Board of Inquiry hearing violated his constitutional rights under the Sixth Amendment. The court has held that it does have jurisdiction to consider those alleged violations. *See* discussion *supra* at A. However, a finding that the court has jurisdiction to consider a claim does not

necessarily make that claim viable. In this case the claim is without merit.

The Sixth Amendment states: *"In all criminal prosecutions,* the accused shall enjoy the right ... to be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI (emphasis added). In this case, as in *Yount v. United States,* "plaintiff misapprehends the nature of the sixth amendment, which pertains only to criminal prosecutions." 23 Cl.Ct. 372, 379–80 n. 8 (1991). In *Yount,* the Air Force National Guard discharged an officer under other than honorable conditions for misconduct. Prior to discharge, the officer was afforded a review by an Officers Efficiency Board (OEB) which considered oral and documentary evidence. The officer complained that he had been denied due process, and the court held that the officer's reliance on the Sixth Amendment was misplaced because the proceeding was not criminal in nature.

This case, like *Yount,* involves administrative discharge proceedings, not criminal prosecution. *See Kindred,* 41 Fed.Cl. at 113 ("an administrative discharge hearing is not a criminal proceeding"). Consequently, plaintiff's reliance on the Sixth Amendment is no more availing than it was in *Yount,* and the court will dismiss plaintiff's third claim as a matter of law.

### 2. Fifth Amendment Rights to Confrontation, Cross-examination, and Compulsory Process

■ Plaintiff also argues that the Fifth Amendment's right to procedural due process guaranteed him the right to call, confront, and cross examine Mary Milas as a witness before the Board of Inquiry. The court recognizes that plaintiff's other than honorable discharge did stigmatize him and the administrative discharge proceedings did affect his liberty interests. Consequently, the court holds that plaintiff is entitled to due process. *See* discussion *supra* at B; *Canonica,* 41 Fed.Cl. at 524. However, a careful analysis of the applicable law and facts demonstrates that plaintiff's due process rights were not violated.

The court acknowledges that in civilian cases the Supreme Court has held that procedural due process generally requires confrontation and cross-examination in proceedings which determine whether the person will be deprived of his or her livelihood. *See, e.g., Willner v. Committee on Character and Fitness,* 373 U.S. 96, 103, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963) ("procedural due process often requires confrontation and cross-examination of those whose word deprives a person of his livelihood"); *Greene v. McElroy,* 360 U.S. 474, 496–500, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (right to be confronted with witnesses against one has been applied "in all types of cases where administrative and regulatory actions were under scrutiny," and petitioner could not be deprived of job in proceeding without confrontation and cross-examination absent explicit authorization by President or Congress).

However, the Supreme Court has also "recognized in past cases that 'the tests and limitations [of due process] may differ because of the military context.'" *Weiss v. United States,* 510 U.S. 163, 177, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994) (quoting *Rostker v. Goldberg,* 453 U.S. 57, 67, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) (text as modified in *Weiss* )). The Supreme Court explained that

> Congress, of course, is subject to the requirements of the Due Process Clause when legislating in the area of military affairs, and that Clause provides some measure of protection to defendants in military proceedings.[6] But in determining what process is due, courts "must give particular deference to the determination of Congress, made under its authority to

regulate the land and naval forces, U.S. Const., Art. I, § 8."

*Weiss,* 510 U.S. at 176–77, 114 S.Ct. 752 (quoting *Middendorf v. Henry,* 425 U.S. 25, 43, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976)). "Judicial deference thus "is at its apogee" when reviewing congressional decisionmaking in this area." *Id.* (quoting *Rostker,* 453 U.S. at 70, 101 S.Ct. 2646).

Plaintiff's primary objection is that the "government refused to produce Mary Milas"[7] so that she might provide exculpatory evidence.[8] However, plaintiff's inability to compel Mary Milas to testify against her will at the Board of Inquiry is not error because, in establishing the procedures for administrative discharge based on alleged misconduct, Congress chose not to authorize compulsory process.

In Chapter 60 of Title 10, Congress outlined the procedures to be used for the separation of regular officers for misconduct. *See* 10 U.S.C. §§ 1181–87 (1994). The statute directed the Secretary of the Navy to convene Boards of Inquiry to "receive evidence and to make findings and recommendations" whether an officer had shown cause for retention, and to "give a fair and impartial hearing to each officer" accused of misconduct or substandard performance. 10 U.S.C. § 1182. Definition of many of the detailed procedures was entrusted to the Secretary of Defense and the Secretary of the Navy, *see* 10 U.S.C. § 1181(b), but Congress did establish specific minimum procedural requirements. *See* 10 U.S.C. § 1185(a). The Secretary for Defense must assure that each officer subjected to adminis-

---

**6.** *See also Weiss,* 510 U.S. at 194, 114 S.Ct. 752 (Ginsburg, J., concurring) ("[M]en and women in the Armed Forces do not leave constitutional safeguards and judicial protection behind when they enter military service"); *Doe,* 132 F.3d at 1434 (quoting *Weiss,* 510 U.S. at 194, 114 S.Ct. 752 (Ginsburg, J., concurring)); *Holley,* 124 F.3d at 1466 (same).

**7.** It is noteworthy that plaintiff's argument mischaracterizes the facts. The Navy did not refuse to produce Mary Milas. On the contrary, the government designated Mary Milas as an anticipated witness prior to the time that the Board of Inquiry convened and invited her to appear and testify. In fact, at the hearing, plaintiff's own

counsel acknowledged "for the record that I know that the Government has over a period of time indicated to her [Mary Milas] there [sic] desire for her to make herself available." Plaintiff's counsel further conceded that "the board members as well as I, as well as the Government do not have subpoena power so we can not [sic] compel her to appear." Thus, the government did not "refuse to produce Mary Milas," but rather, she, as a civilian outside of the military's jurisdiction, decided not to testify despite the invitations extended to her.

**8.** Plaintiff suggests that Mary Milas might admit that she had coached Patrick to accuse plaintiff of sexual abuse.

trative discharge proceedings be given (1) written notice, (2) a reasonable time to prepare for the Board of Inquiry, (3) an opportunity to appear in person, (4) representation by counsel before the Board of Inquiry, and (5) full access to records relevant to the case except when national security interests require. *See* 10 U.S.C. § 1185(a). Yet Congress declined to provide Boards of Inquiry or the officers the power to subpoena civilian witnesses. That decision does not appear to be accidental. At the time it enacted Chapter 60, Congress had provided courts-martial with subpoena power broad enough to compel civilian witnesses to testify, 10 U.S.C. §§ 846, 847 (1994), yet this power is notably absent from the statute creating Boards of Inquiry. This critical difference demonstrates congressional intent to distinguish between the due process rights of officers in courts-martial versus officers being administratively discharged for misconduct. *See* 2B Norman J. Singer, *Sutherland Statutory Construction* § 51.02 (1992) (absence of provision in similar statute shows legislature had different intention). Therefore, the court concludes that pursuant to the constitutional authority "[t]o make Rules for the Government and Regulation of the land and naval forces," U.S. Const. art. I, § 8, Congress has made clear "that the imposed [administrative discharge] procedures are necessary and warranted and has authorized their use" without resort to compulsory process. *Greene*, 360 U.S. at 507, 79 S.Ct. 1400.

Because judicial deference is at its apogee when reviewing congressional decisions about due process in military proceedings. *Weiss*, 510 U.S. at 177, 114 S.Ct. 752, the court holds that, in administrative proceedings to discharge military officers for misconduct, due process does not require compulsory process of civilian witnesses who are beyond the jurisdiction of the military. Therefore, the Board of Inquiry's inability to subpoena Mary Milas to testify against her will was not a violation of due process.

Plaintiff also complains that he had a right to confront and cross-examine Mary Milas because she was a "key witness":

> Plaintiff was deprived of his Sixth Amendment right to confront and cross-examine witnesses and by extension his Fifth Amendment right to due process. Mary Milas was a key witness. She was present in the same house when the alleged molestation took place. She was a trained social worker who should have detected any designs [sic] of molestation long before they happened. More importantly, she was knowledgeable enough to coach young Patrick into saying the most damaging things. Finally, there was evidence that she used her professional contacts to help manipulate the system to try to persecute Chaplain Milas. Denying the plaintiff the opportunity to confront and cross-examine her sounded the death knell of fundamental fairness in this case.

Pl.'s Mot. at 25–26; *see also* Complaint at ¶¶ LXVII–LXXI.

Plaintiff's argument erroneously assumes that a witness "who, being present, personally sees or perceives a thing" is necessarily a witness "who testifies to what [s]he has seen, heard, or otherwise observed." *Black's Law Dictionary* 1603 (6th ed.1990). This non sequitur is based on the misconception that two distinct meanings of the word "witness" are fungible.

Furthermore, even if the court were to interpret plaintiff's argument in a way that would avoid the non sequitur, plaintiff's argument still fails. On the one hand, if plaintiff's argument is construed to assert that he was denied the right to confront and cross-examine Mary Milas because she was not a witness against him, the argument fails because the constitution guarantees plaintiff the right "to be confronted with the witnesses against him," U.S. Const. amend. VI, not the right to be confronted with any person who "sees or perceives a thing," *Black's Law Dictionary* 1438. On the other hand, if plaintiff's brief is construed to argue that he was denied the right to confront and cross-examine Mary Milas because, as a key witness, she should have been called as a witness against him, then the argument fails because it is merely a variation on plaintiff's assertion that he should have been afforded

compulsory process.[9] The court has already found that plaintiff was not prejudiced by his inability to subpoena Mary Milas, therefore, this variation on the same argument is also without merit.

## I. Adequate Consideration by the Board of Review

Plaintiff alleges that the Board of Review violated SECNAVINST 1920.6A, enclosure 8, ¶ C(5) (Apr. 17, 1984), which states: "The Board of Review shall review the record, the findings and recommendations of the Board of Inquiry, and any minority reports or rebuttal submitted thereto." *Id.* Plaintiff argues that the Board of Review convened for only four hours, and it would be "physically impossible" for the Board of Review to have reviewed all of the voluminous record in so short a time.

The court must begin the analysis of plaintiff's argument by reiterating the powerful presumption that military officials, including the officers who served on the Board of Review, " 'discharge their duties correctly, lawfully, and in good faith.' " *Doe*, 132 F.3d at 1434 (quoting *Sanders*, 594 F.2d at 813). Plaintiff bears the burden of producing "well-nigh irrefragable proof to overcome the presumption." *Hoffman I*, 16 Cl.Ct. at 410 (quoting *Sanders v. United States Postal Serv.*, 801 F.2d 1328, 1331 (Fed.Cir.1986)). The court finds that plaintiff has not made the necessary showing to demonstrate error. Although the applicable regulation does require the board to "review" the record, findings, and rebuttals, *see* SECNAVINST 1920.6A, enclosure 8, ¶ C(5), neither the regulation nor the applicable statute define with any greater precision the scope of the activity contemplated by the word "review." *See* 10 U.S.C. § 1183, *see also* SECNAVINST 1920.6A, enclosure 1 (definitions section). The court is loathe to impose additional requirements on a procedure which Congress expressly granted the Secretary of the Navy discretion to devise. *See* 10 U.S.C. §§ 1181(a) (Secretaries of Defense and military departments authorized to prescribe regulations to govern review procedures), 1183(a) (Secretary to convene Boards of Review "at such times as the Secretary may prescribe"). Therefore, the court finds plaintiff's argument to be without merit.

## J. Substantial Evidence

Plaintiff argues that the BCNR's decision not to "correct" plaintiff's military record was unsupported by substantial evidence. This argument, too, is unavailing. "The court is not required to re-weigh the evidence, but [to determine] whether the conclusion being reviewed is supported by substantial evidence." *Black*, 28 Fed.Cl. at 183 (internal quotations and emphasis omitted). "Substantial evidence is '[s]uch relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Hoffman I*, 16 Cl.Ct. at 409 n. 2 (quoting *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420). The court finds that substantial evidence did exist to justify the BCNR's decision. The testimony provided by Patrick and the expert witnesses who examined and treated him is adequate to support the BCNR's conclusion that the Secretary did not err in his decision to discharge plaintiff for sexual abuse of a child and to characterize that discharge as other than honorable.

## CONCLUSION

In the absence of any questions of material fact, this case is appropriate for disposition on the administrative record. Having found that none of the claims or arguments advanced by the plaintiff are valid, plaintiff's cross-motion for judgment on the administrative record (filed September 21, 1998) is *DENIED* and Defendant's Motion for Judgment Upon the Administrative Record is *ALLOWED*.

**IT IS SO ORDERED.**

---

9. Rather than complaining that he should have been able to subpoena Mary Milas to testify on his behalf, plaintiff would be complaining that the government should have subpoenaed Mary Milas as a material witness so that plaintiff could cross-examine and confront her.