**Darin R. WEAVER, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–179 C.

United States Court of Federal Claims.

Feb. 7, 2000.

**70**

Walter B. Wells, Slidell, Louisiana, for Plaintiff.

Leslie Cayer Ohta, Washington, D.C., with whom were Acting Assistant Attorney General David W. Ogden, Director David M. Cohen, Assistant Director Bryant G. Snee, for Defendant.

## ORDER

MOODY R. TIDWELL, III, Senior Judge.

Plaintiff Darin R. Weaver was administratively discharged from the United States Navy for sexually abusing his two step-children. After seeking relief at the Board for Correction of Naval Records (BCNR), plaintiff filed a complaint in this court seeking reinstatement with full pay and benefits or, in the alternative, an honorable discharge. The case is now before the court on cross-motions for judgment on the administrative record, pursuant to RCFC 56.1.

## BACKGROUND

### 1. Facts

Plaintiff Daren Russell Weaver enlisted in the United States Naval reserve on September 24, 1981 under the Delayed Entry/Enlistment Program. On July 29, 1982, plaintiff was discharged from the Reserve Component while simultaneously enlisting in the Regular Component of the United States Navy (USN) with the pay grade of E–1. During his thirteen–plus–year career, Mr. Weaver was assigned to various duty stations while serving in the Navy.

Plaintiff and Hospital Corpsman First Class Guyla Marie Weaver were married in January of 1991. Mrs. Weaver had two children, daughter 1, born on June 24, 1981, and daughter 2, born on January 11, 1984, from a previous marriage. At the time of the Weavers' marriage, Mrs. Weaver's ex-husband, Senior Chief Hospital Corpsman (HMCS) Kevin Pearce, USN, shared joint custody of the two girls where they lived in California with their natural father and his second wife, Marquay.

During the summer of 1992, the two daughters visited their mother and petitioner, at their home in Groton, Connecticut. At this time, Mrs. Weaver became aware that Daughter 2 had been physically and psychologically abused by her father, HMCS Pearce. The psychologist overseeing this incident, Dr. G., interviewed both girls in August 1992 and recommended that Daughter 2 be returned to her mother.

Early in 1993, the Weavers moved to West Pittsburg, California, after being reassigned duty stations. Their reassignment to the west coast moved them closer to Mrs. Weaver's daughters, who resided with their natural father. On April 7, 1993, Dr. T., a clinical psychologist in California, evaluated Daughter 2. This doctor determined that Daughter 2 displayed "significant behavior problems" and suffered from "moderate to severe" emotional disturbance. Dr. T. further concluded that these problems "appear[ed] more than [a] situational reaction" to the divorce of her

parents. Both girls began seeing separate therapists. The Family Advocacy Program (FAP) investigation, completed through the Social Work Department at the Naval Hospital in Groton, Connecticut, substantiated the report that, on one occasion, Mr. Pearce had grabbed daughter 2 by the throat and slammed her against the wall.

On September 9, 1993, Daughter 1 and Daughter 2 told HMCS Pearce that Mr. Weaver molested them. Daughter 2 reported that plaintiff had molested her at his California residence on or about August 22, 1993. Daughter 1 reported that plaintiff had molested her the previous year at the Connecticut address during August 1992. After hearing this information from his daughters, Mr. Pearce notified Mrs. Weaver. That evening, she went to the Pearce's home, and after interviewing both of the girls, came to the conclusion that they were lying. Marquay Pearce scheduled an appointment with the children's psychologists for the following day.

On September 10, 1992, Dr. Witte met with Daughter 1 who related three sexual incidences between her and Mr. Weaver, all occurring over a three–day weekend during a visit to the Weaver's home in Connecticut. First, Daughter 1 told the doctor that on one occasion plaintiff picked her up while she was sleeping and carried Daughter 1 to his bedroom where he placed her face down on his bed. Mr. Weaver then removed her panties and placed his penis between her legs. Secondly, Daughter 1 told Dr. Witte that one time Mr. Weaver woke her up and placed her hand on his penis. Finally, Daughter 1 informed the doctor that one time she found plaintiff watching her take a shower. Daughter 2 met with Dr. Puryear on the same day. Daughter 2 told the doctor that on one occasion, at the Weaver's home in California, plaintiff walked into her bedroom and placed her hand on his erect penis.

Upon the recommendation by Dr. Witte, Mr. Pearce reported the incidences to Child Protective Services (CPS), in San Francisco, California, on September 10, 1993. CPS then reported the incidence to the Contra Costa County Sheriffs Office (CCCSO). Both girls told the CCCSO detective investi-

gating the matter that they had not told anyone about these incidences before this point in time, including their mother, because they were scared and did not think their mother would have believed them. The CCCSO then referred the matter to the Naval Criminal Investigative Service (NCIS) because only one incidence occurred in Contra County.

On September 15, 1993, the Family Advocacy Representative (FAR) at the Naval Medical Center Oakland (NMCO), California, notified the FAR at Mare Island because Mr. Weaver was in the Mare Island "catchment area." On the same date, the case was reported to the Bureau of Naval Personnel (BUPERS). A few weeks later, on October 6, 1993, the Case Review Subcommittee (CRS) at Mare Island substantiated the allegations made by the two girls. In making its determination, the CRS relied on the statements made by Daughter 1 and Daughter 2 and the fact that both girls "had become 'resistant to week-end visits with their mother and step-father.' "

On November 4, 1993, the FAR referred Mr. Weaver for psychosexual evaluation, which was refused by plaintiff. The case was then returned to the FAP at NMCO. On December 15, 1993, upon advice of counsel, Mr. Weaver declined to answer any questions concerning the allegations against him. On that same day, the NCIS forwarded its report, along with the interview report, the CCCSO report, and two FAC memoranda regarding the incidences, to Mr. Weaver's command at the NMCO. On March 31, 1994, the staff judge advocate, NMCO, assigned to plaintiff's case notified the FAR that there existed insufficient evidence to justify a trial by court-martial. On April 5, 1994, the FAR informed the BUPERS (PERS) 661–D case manager that the legal case against Mr. Weaver was closed and that the command would forward the related documents to PERS 661–D for further disposition of the case. On October 12, 1994, the Head, Social Work Department, NMCO, submitted a case summary report to the Commander at the NMCO.

A few days later, on October 18, 1994, the Commander, NMCO, forwarded the Family

Advocacy Case Summary to the Family Advocacy Branch of the BUPERS. In his summary, the Commander reported that plaintiff's performance had been "consistently outstanding," and suggested that Mr. Weaver had potential worthwhile service. One month later, on November 17, 1994, BUPERS 661D prepared a briefing summary in which the briefer stated that "[t]he girls were consistent in their reports to their natural father, CPS, therapists and CCSO regarding the alleged sexual abuse."

On January 10, 1995, the Head, Family Advocacy Program (FAP) Section (Pers–661) sent a memorandum to the Director of the Enlisted Performance Division (Pers–83) articulating the FAPs position with regard to plaintiff. The Head explained that the FAP concurred with the Family Advocacy Review Subcommittee which had previously substantiated the case of sexual abuse against Mr. Weaver. Additionally, the memorandum stated that Mr. Weaver was not eligible for the FAP because "of his failure to accept responsibility for the sexual molestation of his stepdaughters." Further, the Head announced the FAPs recommendation that Mr. Weaver be administratively separated "for the commission of a serious sexual perversion." Apparently heeding this recommendation, BUPERS commanded NMCO to initiate the administrative separation proceedings against plaintiff on February 1, 1995.

On March 9, 1995, Mr. Weaver, reacting to this order, elected to have a hearing before an Administrative Discharge Board (ADB). A few months later, plaintiff's defense counsel had Mr. Weaver undergo a psychological evaluation. Katherine R. Powell, Ph.D., conducted the evaluation and administered several psychological tests on plaintiff. In a June 11, 1995 letter to Mr. Weaver's defense counsel, upon analysis of these tests, Dr. Powell concluded the following:

> Based on the objective findings of the battery of standardized tests, there is no evidence or data that supports pathology and/or deviancy within Mr. Weaver. He does not demonstrate personality defects, patterns or traits that are found in sex offenders, especially in offenders of children in or out of the family. There is no

evidence in the data that supports that Mr. Weaver is deviant, or is potentially a danger to society. The value of administering so many tests is that they double check findings with sub-scales of each separate test. On every test, Mr. Weaver has consistently no negative findings which are of clinical concern, or that suggest pathology.

Dr. Powell also forwarded a second letter to Mr. Weaver's defense counsel in which she reported her findings and conclusions of her May 18, 1995 interview with plaintiff and a review of various documents concerning the past mental history of Daughter 1 and Daughter 2. The doctor found Mr. Weaver to be trustworthy and forthcoming with his account of the related events as well as his feelings about the allegations against him. She determined plaintiff "to have no abnormal thinking or emotional patterns in evidence." Concerning Daughter 1 and Daughter 2, Dr. Powell found that they undergone abnormal developmental behavior long before the alleged incidences involving Mr. Weaver. She emphasized that Daughter 2 had been diagnosed with oppositional defiant disorder in 1993, which "is generally reserved for very disturbed children, who have a tendency to act out aggressively, have negativistic and hostile attitudes and behaviors, deliberately annoys people, refuses to comply with adults or rules of adults, often blames others for their mistakes, are angry and resentful and are often spiteful and vindictive ..." Further, she noted that Daughter 2 had been previously abused by her natural father and was described as angry at her mother after finding out they had to live with their father instead of their mother. Dr. Powell explained that children with this history typically cast blame on another person for their anger, for instance, her husband Mr. Weaver. She further observed that Daughter 1 had a documented history of abandonment and anger directed at both of her parents. Finally, Dr. Powell concluded that there was "no substantial information that supports the allegations of child molest (sic) on the part of Mr. Weaver."

On June 21, 1995, plaintiff's wife, Guyla Weaver, submitted a sworn affidavit in support of Mr. Weaver's petition to the ADB.

Mrs. Weaver began by explaining that her marriage to HMCS Pearce ended in divorce after much feuding between the couple in front of Daughter 1 and Daughter 2. She then described her observations of her daughters and how they reacted towards this separation and their open quarreling. Mrs. Weaver found that the girls lacked someone to talk to about their feelings of abandonment and contempt towards their parents because HMCS Pearce, their custodial parent, was often away from home on ship duty. She then described how Daughter 1 and Daughter 2 became even more angry with her after it was decided that they could not move into the Weaver's home. Soon after the girls found out, Mrs. Weaver explained, they made the allegations against plaintiff. Mrs. Weaver said that she had spoken to her daughters about these accusations that same night, and deduced that they had not been telling the truth. She arrived at this conclusion after observing that the two girls would not make eye contact with her when she inquired about the incidences. She also surmised that both of her daughters were still angry with her because they wanted to live with their mother, and believed that their natural parents would still get back together if Mrs. Weaver had not married plaintiff. She closed her remarks by stating that she believed Mr. Weaver could never have committed the incidences for which he had been accused of.

The Administrative Discharge Board convened on June 21, 1995. The session opened after the recorder introduced substantive evidence in support of the discharge. This evidence included the Pers–661 letter of January 10, 1995, the Per–83 message of February 1, 1995, the NCIS report, and an article on recognition of sexual abuse in children. Over the objection of Mr. Weaver's military counsel, the article on sexual abuse was admitted as evidence before the ADB. Plaintiff's attorney then introduced into evidence the two letters submitted by Dr. Powell, Guyla Weaver's affidavit, six character statements, all of Mr. Weaver's military performance evaluations, and other favorable material from his service record.

The ADB then heard testimony from both Daughter 1 and Daughter 2 via telephone. They were examined by the government and then cross-examined by Mr. Weaver's military attorney. Both girls testified as to the aforementioned incidences. Daughter 1 stated that she had not told anyone of the sexual encounters with plaintiff, including her natural parents and her psychologists with whom she saw every Friday for over two year after the time of the alleged molestation, because she presumed nobody would believe her. Daughter 2 stated that she wanted to live with her mother because her father and stepmother were treating her badly. After finding out that she could not live with her mother, and believing this was because plaintiff and Mrs. Weaver were together, Daughter 2 spoke up and told HMCS Pearce about the incidence between her and Mr. Weaver. She further said that she did not make up the allegations so that she could live with her mother. Both girls testified that they were telling the truth.

HMCS Pearce then testified as to his relationships with Mrs. Weaver and his two daughters. He stated that Daughter 1 expressed her desire not to visit the Weavers' on several occasions after the incident. He also said that he believed his daughters' allegations of molestation by plaintiff, and denied ever having physically abusing either of them in the past himself. He further stated that his belief in these allegations were not based on the changed relationship between himself and Guyla Weaver. Additionally, HMCS Pearce said that he believed Daughter 1 to be socially retarded and Daughter 2's behavior to be that of a six–year old. Finally, he stated that he had noticed changes in the girls behavior around the time of the first incident in 1992.

Marquay Pearce then testified about the behavioral changes in Daughter 1 and Daughter 2 in 1992, and that she had mentioned these changes to daughter 1's therapist.

Mr. Weaver's legal counsel then called two lieutenant commanders, each of whom gave exemplary character testimony on plaintiff's behalf. Mr. Weaver then testified. He denied the allegations of sexual molestation as-

serted by Daughter 1 and Daughter 2. He also stated that he did use the bathroom on one occasion when Daughter 1 was taking a bath; however, he had left the door open while his wife sat nearby in the living room. Finally, Mr. Weaver stated that he had been advised not to undergo psychological evaluations administered by FAP because he understood that if he had, then he would have been admitting guilt by receiving the treatment.

After a three hour deliberation, the ADB reconvened and announced a unanimous finding that Mr. Weaver had committed the alleged misconduct, and unanimously recommended an Other Than Honorable (OTH) discharge. The ADB report revealed that its decision had been based on "all of the exhibits presented, testimony of the witnesses via phone, and witnesses who testified (in person)."

On June 22, 1995, plaintiff's counsel submitted a letter of deficiencies relating to Mr. Weaver's separation processing. He asserted that the March 1, 1995 notification letter was deficient because it only cited the NCIS report and did not cite specific allegations of sexual misconduct. He further alleged that the Pers–83 memorandum, stating that the sexual abuse allegations against Mr. Weaver, had been wrongfully substantiated. Plaintiff argued that since this finding of substantiation was founded upon the consistency of Daughter 1 and Daughter 2's statements, and both girls had met with their parents prior to each statement, the conclusion was misleading and unduly prejudicial for the ADB to consider. Mr. Weaver further asserted that his non-entry into the FAP, due to his unwillingness to take responsibility for the sexual misconduct, should not have been considered because it would have required him to admit guilt. This letter was supplemented on July 28, 1995 with another letter by Mr. Weaver's counsel. This letter asserted that plaintiff's legal counsel had come into information that FAP had maintained files on Daughter 1 and Daughter 2 and was not turned over to them prior to the ADB hearing. He claimed that he had been denied a full and fair opportunity to be heard.

On August 17, 1995, the Commander, NMCO Pers–83, submitted the Administrative Discharge Board results to the Chief of Naval Personal, Pers–82. In his memorandum, the Commander disagreed with the ADB findings and recommendations of the board. The Commander supported his conclusions based on a review of the transcript of the ADB with its exhibits and report, and the letters of deficiencies. He reasoned that Daughter 1 and Daughter 2 had not been consistent in their testimony, they had a history of emotional disturbances and there had been no physical evidence or witness to the molestation. Additionally, the Commander noted that the two girls had "strong motivations to discredit plaintiff in order to remove him as a competitor for their birth mother's love." He further pointed out that Mr. Weaver was an exemplary sailor who had been evaluated by a notable psychologist who testified as to his innocence. In response to the memorandum, on September 29, 1995, Pers–83 directed that Mr. Weaver be administratively discharged within ten days under Other Than Honorable conditions. The reason stated for this action was for misconduct.

On October 11, 1995, plaintiff appealed to the Chief of Naval Personal for a flag review of his administrative discharge. In support of his request, Mr. Weaver asserted that he had been stigmatized after being labeled a child molester without the benefit of a general court martial. In view of the questionable credibility of the alleged victims and the failure of the government to criminally charge plaintiff. Mr. Weaver petitioned for either a review of his case or a court-martial. Plaintiff's request was supported by the Commander, NMCO, who voiced his concerns that the evidence did not support, even by a preponderance, the administrative discharge of Mr. Weaver.

In an approved memorandum for the Deputy Chief of Naval Personnel, dated January 15, 1996, the Assistant Chief of Naval Personnel for Military Performance and Security recommended Mr. Weaver's separation under an Other Than Honorable discharge. On January 22, 1996, the Chief of Naval Personnel, Pers–83, issued an advisory message de-

nying plaintiff's request and confirmed his separation under an Other Than Honorable discharge. Mr. Weaver was discharged on February 15, 1996 under Other Than Honorable conditions, citing misconduct as the reason for separation.

On or about January 3, 1997, plaintiff petitioned the Board for Correction of Naval Records. In Mr. Weaver's prayer for relief, he requested that he either be restored to active duty, or credit him with sufficient time to meet the fifteen year retirement criteria and transfer him to Fleet Reserve, or correct his discharge status to honorable, and adjust his re-enlistment code to RE–1. In support of his application, plaintiff asserted that he was denied access to the Family Advocacy Review Subcommittee records which, he argues, may have contained exculpatory information. Mr. Weaver advanced that the ADB improperly admitted the Head. Family Advocacy Program (Pers–661D), memorandum. This memorandum concurred with the Family Advocacy Case Review Subcommittee in its substantiation of sexual abuse on the part of Mr. Weaver and it recommended his administrative separation. Plaintiff additionally asserted that he had been denied his Sixth Amendment right to confront his accusers at the ADB hearing.

In order to arrive at a fair and equitable decision in the matter, on July 15, 1997, the BCNR requested an advisory opinion from the Office of the Judge Advocate General (Code 13) regarding the merits of Mr. Weaver's case. On April 17, 1998, the Head, Military Affairs and Personnel Branch, advised the BCNR that the petition lacked legal merit. The BCNR then forwarded the advisory opinion to Mr. Weaver's legal counsel, on April 22, 1998, for his response. On May 18, 1998, Mr. Weaver's attorney submitted his response to the BCNR. On June 2, 1998, the BCNR requested an advisory opinion from the Chief of Naval Personnel (Pers–66). Pers–66 issued an advisory memorandum on September 4, 1998 in which it determined the case against Mr. Weaver was sufficiently substantiated. On September 16, 1998, the BCNR submitted the Pers–66 advisory opinion to plaintiff's legal counsel and requested a response. This response, dated

September 19, 1998, was forwarded to the BCNR, along with additional information regarding Mr. Weaver's review. This information included, inter alia, procedural guidelines for Family Advocacy Representatives (NAVMEDCOMINST 6320.22).

The three-member panel of the BCNR issued its unanimous decision on December 15, 1998. The panel found the evidence supporting Mr. Weaver's petition to be insufficient to establish the existence of probable material error or injustice. The BCNR determined the most damning evidence to be the testimony of the two girls. The Panel found the Administrative Discharge Board to have been in the best position to weigh the girls' credibility in the face of their history of past psychological problems, abuse and motive to distort the truth. Additionally, the Board agreed with the JAG advisory opinion that *Brady v. Maryland,* 373 U.S. 83, 83. S.Ct. 1194, 10 L.Ed.2d 215 (1963), was confined to criminal proceedings, but for one exception that did not apply in Mr. Weaver's case. The panel held, therefore, that plaintiff did not have a due process right to the Family Advocacy files. The BCNR further noted that at no time did Mr. Weaver provide any basis that exculpatory evidence had been withheld from him during any of the proceedings. The Panel additionally found that, even though BUPERS may have used the undisclosed Family Advocacy file in arriving at its decision, the ADB did not. Moreover, the BCNR clarified that plaintiff received all materials that were used in the Administrative Discharge Board's consideration of Mr. Weaver's case. Hence, the Panel agreed with the JAG opinion that this non-disclosure of the FAP reports to be non-material.

The BCNR also considered the admission of the January 10, 1995 BUPERS memorandum submitted in the ADB hearing. Plaintiff argued in his appeal to the BCNR that the memorandum should not have been introduced because he was not given an opportunity to submit material to the Case Review Subcommittee (CRS) and that certain members of the FAP were personally biased against him. First, the Board observed that Mr. Weaver had declined to respond or make a statement regarding the incidents to the

Naval Criminal Investigative Service or to undergo a psychological evaluation at their request. This led the Board to believe that plaintiff would not have chosen to make a submission to the CRS. Secondly, the BCNR found that Mr. Weaver's legal counsel failed to object to the introduction of the memorandum at the ADB hearing, thus waiving his right to base his appeal on its admission. Moreover, the panel determined that, even if plaintiff had objected, the memorandum would have been properly admitted regardless of the objection. The Board noted that Article 3640350.2a of the Naval Military Personal Manual (MILPERSMAN) allows for all relevant evidence to be admitted at an ADB proceeding.

Mr. Weaver further objected that he was denied his right to examine his accusers pursuant to the confrontation clause of the Sixth Amendment. The BCNR agreed with the JAG advisory opinion that plaintiff had the opportunity to confront the two girls, albeit via telephone. Thus, there was no denial of Mr. Weaver's rights in this regard.

Finally, the BCNR held, contrary to plaintiff's assertion, that the decision of the ADB had been supported by a preponderance of the evidence, pursuant to Article 134 of the Military Code of Justice, 10 U.S.C. § 934.

On March 31, 1999, plaintiff filed his complaint in this court asserting four causes of action. First, plaintiff alleged violation of his Fifth Amendment's right to due process. The second cause of action claims that the BCNR improperly failed to correct plaintiff's record despite substantial evidence that plaintiff did not commit the alleged misconduct. Third, plaintiff asserts that his Sixth Amendment rights to compulsory process and confrontation were violated. Finally, plaintiff complains the BCNR acted arbitrarily and capriciously in its review of plaintiff's case and in failing to correct his record. The United States filed defendant's Motion for Judgment on the Administrative Record on July 20, 1999. Plaintiff responded on August 30, 1999, with plaintiff's opposition to defendant's Motion for Judgment on the Administrative Record and Cross–Motion for Judgment on the Administrative Record.

## ANALYSIS

Motions for judgement on the administrative record are reviewed under the same standards as motions for summary judgment. *See* RCFC 56.1(a); *Richey v. United States*, 44 Fed.Cl. 577, 581 (1999). Such motions are appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As in the case at bar, when both parties enter motions for judgment on the administrative record, each party bears its own burden to demonstrate the lack of genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In meeting this high standard, the court infers all evidence in the light most favorable to the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986).

### A. Jurisdiction

This court's jurisdiction, like any other court of the United States, is statute driven, thereby limiting the power of this court to hear cases outside that which is granted by the statute. *See Boddie–Noell Enterprises, Inc. v. United States*, 36 Fed.Cl. 722, 728 (1996), *aff'd*, 132 F.3d 54 (Fed.Cir.1997).

The current action is brought pursuant to the Administrative Procedures Act (APA), 5 U.S.C. § 702 (1996), and the Tucker Act, 28 U.S.C. § 1491 (1994). The APA entitles any person who has been legally wronged by an agency to obtain judicial review, thereby waiving sovereign immunity of the United States. *See* 5 U.S.C. § 702 (1996); *Martinez v. United States*, 26 Cl.Ct. 1471, 1476 (1992). However, the APA may not act as an independent means of jurisdiction because the statute does not mandate the payment of money damages. *See Mitchell v. United States*, 26 Cl.Ct. 1329, 1334 (1992).

The Tucker Act, also constituting a waiver of sovereign immunity for certain claims, grants this court "jurisdiction to render judgment upon any claim against the United

States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department ..." 28 U.S.C. § 1491(a)(1)(1994); *see United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Although the claim must be one for money damages not sounding in tort, *see United States v. King,* 395 U.S. 1, 2–3, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969), this court has been granted jurisdiction to "provide an entire remedy and to complete the relief afforded by the judgment," 28 U.S.C. § 1491(a)(1) (1994), and authorized to "issue orders directing restoration to office or position ... and correction of applicable records." 28 U.S.C. § 1491(a)(2) (1994).

### B. Standard of Review

■ Petitioners seeking review of a BCNR ruling carry the heavy burden of proving, by clear and convincing evidence, "that the correction board's decision was illegal because it was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, or money is due." *See Hoskins v. United States,* 40 Fed.Cl. 259, 271–72 (1998) (*quoting Palmer v. United States,* 38 Fed.Cl. 316, 324 (1997); and *Gallucci v. United States,* 41 Fed.Cl. 631, 643 (1998)). Additionally, upon review of military "decisions on discipline, morale, composition and the like ... a court should not substitute its view for the 'considered professional judgment' of the military." *See Crager v. United States,* 25 Cl.Ct. 400, 406 (1992) (*citations omitted*). The court should, therefore, give the "widest possible latitude to military decisions, giving it special deference." *See id.* Thus, mere technical errors will not merit a reversal of the Board's decision; rather, "the error must be a violation of 'mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced.' " *See Milas v. United States,* 42 Fed. Cl. 704, 712 (1999) (*quoting Gallucci,* 41 Fed. Cl. at 643).

### C. Constitutional Claims

#### i. Constitutional Right to Fifth Amendment Due Process

Plaintiff brings forth constitutional claims in two of his stated causes of action. First, Mr. Weaver alleges that he was denied his right to due process under the Fifth Amendment to the United States Constitution.[1] Plaintiff asserts that his administrative discharge resulted in the stigmatization of his name because of the Other Than Honorable status, thereby invoking a liberty interest for which he was denied. The court recognizes Mr. Weaver was stigmatized by the Other Than Honorable administrative discharge for reasons of sexual misconduct and, therefore, was entitled to due process. *See Canonica v. United States,* 41 Fed.Cl. 516, 524 (1998) (*citations omitted*) (noticing that, although enlisted members of the armed forces do not retain a *property interest* in their employment because they may be discharged by the secretary of the individual service, they do hold a *liberty interest* in their employment); *Keef v. United States,* 185 Ct.Cl. 454, 467, 1968 WL 9154 (1968) (stigma attaches when, *inter alia,* the discharge certificate denotes the separation took place under derogatory circumstances); *see also Correa v. Clayton,* 563 F.2d 396, 397 fn. 1 (9th Cir.1977) (*citations omitted*) (stigmatization may occur upon the reception of a general discharge because the majority of discharges are honorable ones, and may result in significant disadvantages in the job market). The issue then becomes what constitutional process was Mr. Weaver entitled to and did he receive it.

■ A service member discharged with a stigma attached as part of his separation is constitutionally entitled to notice and a pre-discharge hearing. *See Vierrether v. United States,* 27 Fed.Cl. 357, 364 (1992) (*citing Keef v. United States,* 185 Ct.Cl. 454, 467 (1968)) (settled rule is that notice and predischarge hearing are only required if separation inflicts stigma or has some derogatory connotation that follows the service member); *see also Cleveland Board of Education v. Loud-*

---

1. The Fifth Amendment to the United States Constitution states in relevant part "No person shall be ... deprived of life, liberty, or property, without due process of law..."

*ermill et al.,* 470 U.S. 532, 545, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (*quoting Mathews v. Eldridge,* 424 U.S. 319, 343, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)) (remarking that "something less" than a full evidentiary hearing is sufficient prior to an adverse administrative action); *Cotnoir v. University of Maine Systems, et al.,* 35 F.3d 6, 10 (1st Cir.1994) (*quoting Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct..1187, 14 L.Ed.2d 62 (1965)) ("The basic purport of the constitutional requirement is that, before a significant deprivation of liberty ... takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner' ").

In the case at bar, plaintiff was afforded due notice and a hearing administered by the Administrative Discharge Board, a decision that was reviewed by the Board for Correction of Naval Records. Mr. Weaver was furnished with the opportunity to gather discovery, present evidence to the Board and argue the merits of his claim. The panel, nonetheless, found his claim to be without merit and upheld the Other Than Honorable discharge.

Plaintiff further contends that the Administrative Discharge Board and the Board for Correction of Naval Records considered information that was irrelevant and incompetent. Specifically, Mr. Weaver complains that the Pers–661D Memorandum, which articulated the "substantiation" of Mr. Weaver's sexual misconduct by the Family Advocacy Program, should not have been admitted into evidence at the ADB hearing. Plaintiff asserts that this piece of evidence was unreliable, irrelevant and prejudicial to his case. He argues that the memorandum lacks reliability and relevancy because it was "based on an improper evaluation of incomplete evidence at a closed meeting conducted in violation of plaintiff's due process rights." First, as defendant properly notes, the rules of evidence are not applied in Navy administrative discharge board hearings. *See* MILPERSMAN 3640350.5.c. Second, plaintiff's military counsel did not object to the admission of this document at the time it was offered to the ADB for its

consideration at the hearing. Finally, pursuant to MILPERSMAN 3640350.1, the ADB is empowered to determine the weight and credibility of .evidence before it. The ADB, therefore, was properly afforded the opportunity to consider the memorandum, along with the other evidence presented, in accordance to its weight and credibility.

■ Plaintiff's argument that the "source documents" for which this. memorandum was based on were wrongfully withheld from plaintiff prior to the ADB hearing is also of no substantive consequence. First, the memorandum was submitted to the ADB without the source documents attached. Therefore, plaintiff received the identical document, in its entirety, that was submitted to the ADB. The ADB was also not able to consider the source from which the document was drafted, and could have taken notice of this in giving weight to the piece of evidence. Further, the *Brady rule* was not applicable in the case at bar. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963). The *Brady rule* was developed to protect criminal defendants from prosecutorial misconduct, by granting criminal defendants discovery from the government. *See* Nicholas A. Lambros, *Conviction and Imprisonment Despite Nondisclosure of Evidence to the Accused by the Prosecution: Standard of Materiality Reconsidered,* 19 New Eng. J. on Civ. Confinement 103, 106 (1993). However, administrative discharge hearings are not criminal procedures and, therefore, do not give rise to the *Brady rule* requirements of disclosure. *See Kindred v. United States,* 41 Fed.Cl. 106, 113 (1998); *see also Garrett v. Lehman,* 751 F.2d 997, 1002–03 (9th Cir. 1985) ("foundation of such proceedings (ADB) is to determine eligibility for military service; not to punish for past wrongs").

Mr. Weaver further argues that the actions taken by the Case Review Subcommittee were improper because the CRS did not allow him the opportunity to be heard prior to its decision to substantiate the sexual abuse on the part of plaintiff. He relies on the recent Federal Circuit decision which holds that ex parte communications to a deciding administrative official may have the effect of undermining the public employee's

constitutional right to due process. *See Stone v. Federal Deposit Insurance Corp.,* 179 F.3d 1368, 1376 (Fed.Cir.1999). However, the finding made by the CRS was not an integral part of the administrative discharge proceedings; rather, it was part of the investigatory process. The CRS did not make any decisions regarding the separation of plaintiff; it merely determined whether or not the allegations made against him were substantiated. That said, however, Mr. Weaver was in fact afforded his constitutional right to due process during the ADB hearing. *See Milas,* 42 Fed.Cl. at 712 (*quoting Canonica,* 41 Fed.Cl. at 524) ("due process rights are typically fulfilled by notice of the government act and an opportunity to respond *before or after the act.*") (*emphasis added*). Therefore, plaintiff's argument that he was denied due process during the CRS investigation fails.

Plaintiff additionally argues that he was denied potentially exculpatory information that deprived him in the preparation of his case. Mr. Weaver was entitled to inspect the material being forwarded to the separation authority supporting the basis for the proposed separation. *See* MILPERSMAN 3640200.5.4.c; *see also Sargisson v. United States,* 913 F.2d 918, 921 (Fed.Cir.1990) (*quoting Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir.1988)) ("It has long been established that government officials must follow their own regulations . . ."). Plaintiff had the opportunity to inspect the material submitted to the ADB and the BCNR, and was afforded time to make any objections to its admission.

As previously stated, the *Brady rule* was not implicated in the case at bar. *See discussion, supra.* Further, plaintiff has proffered no support for his contention that he has a constitutional right to *Brady*-type material submitted to the CRS. Mr. Weaver was certainly provided all materials submitted to the ADB, the adjudicative authority in his separation hearing. The ADB afforded plaintiff the opportunity to examine all evidence proffered by the government, object if warranted, and submit any supporting material on his own behalf. The ADB was not able to consider the supporting documents that the CRS relied upon because they were not submitted for admission. In the face of these missing documents, the ADB was, nonetheless, able to properly weigh the evidence before it and render a sound and complete ruling. Therefore, plaintiff's argument that the withholding of these documents deprived him of his constitutional right to due process is likewise unfounded.

### ii. Fifth and Sixth Amendment Right to Compulsory Production and Confrontation

The second constitutional argument advanced by plaintiff is that he was denied his Fifth and Sixth Amendment rights to compulsory production and confrontation. Specifically, Mr. Weaver asserts that he was wrongfully denied the opportunity to *personally* confront and cross-examine his accusers, namely, Daughter 1 and daughter 2. Although permitted the opportunity to cross-examine the girls via telephone, plaintiff maintains that this did not provide adequate safeguards. First, Mr. Weaver contends that the Board was unable to consider the demeanor of the witnesses. Second, he argues that, because the two girls were in the same room as HMCS Pearce during their testimony, they were susceptible to being coached by signs or written notes by him.

This court has previously held that the Sixth Amendment guarantees only arise in criminal prosecutions. *See Milas,* 42 Fed. Cl. at 716 (*citing Yount v. United States,* 23 Cl.Ct. 372, 379–80 n. 8 (1991)). Since administrative discharge hearings are not criminal proceedings, as previously discussed, plaintiff enjoys no Sixth Amendment protections in the case at bar. *See Milas,* 42 Fed.Cl. at 716 (*citing Kindred,* 41 Fed.Cl. at 113).

As previously discussed, Mr. Weaver is entitled to due process under the Fifth Amendment to the United States Constitution. In determining what process an individual is entitled to, the Supreme Court has held that "courts 'must give particular deference to the determination of Congress, made under its authority to regulate the land and naval forces, U.S.C.A. Const. Art I, § 8.' " *See Weiss v. United States,* 510 U.S. 163, 176–77, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994)

(*citing Middendorf v. Henry*, 425 U.S. 25, 43, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976)). Thus, the Supreme Court has "recognized in past cases that 'the tests and limitations [of due process] may differ because of the military context.'" *See Weiss*, 510 U.S. at 177, 114 S.Ct. 752 (*quoting Rostker v. Goldberg*, 453 U.S. 57, 67, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981)); *see also Unglesby v. Zimny*, 250 F.Supp. 714, 718 (N.D.Ca.1965) (*citing Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162–63, 71 S.Ct. 624, 95 L.Ed. 817 (1951)) (Frankfurter, J., *concurring*) (determining that due process, conformed to at least minimal constitutional standards by Congress, are to be construed as flexible in nature during administrative discharge board hearings).

The applicable military regulations during an administrative discharge hearing allow the parties to request the appearance of witnesses on their behalf, to call witnesses at the hearing, and to "question any witness who appears before the board." MILPERS-MAN 3640350.5.b. Congress did not, however, provide the ADB the power to subpoena civilian witnesses to testify at the hearing. *See Milas*, 42 Fed.Cl. at 718. The government fulfills its due process obligation by providing petitioners at administrative discharge hearings with "(1) written notice, (2) a reasonable time to prepare for the Board of Inquiry, (3) an opportunity to appear in person, (4) representation by counsel before the Board of Inquiry, and (5) full access to records relevant to the case except where national security interests require." *See Id.* (*citing* 10 U.S.C. §§ 846, 847 (1994)). In the case at bar, plaintiff was provided with the aforementioned requirements.

Further, Mr. Weaver did not, at anytime during the ADB proceedings, object to the telephonic testimony utilized by the two girls. Plaintiff and his attorney were given the opportunity to make such an objection during the hearing, but chose to waive this right. Indeed, this issue was not even raised during the cross-examination of these witnesses by plaintiff's legal counsel. Moreover, Mr. Weaver never invoked his Fifth Amendment right to confront his accusers to the BCNR. Rather, he merely alleged his Sixth Amend-ment right to confrontation, which has been held not to be applicable in the case at bar. *See discussion, supra.* Although plaintiff was not required to pursue relief at the BCNR level to obtain relief in this court,

> [I]egal precedent dictates that it is inappropriate for this court to review on appeal [ ] new issues which should have been brought to the attention of the administrative agency competent to hear it, in this case, the BCNR. A party is not entitled to many independent chances to prevail, and his voluntary choice [to appeal to the BCNR] determines the extent of the court's review.

*See Milas*, 42 Fed.Cl. at 710 (*quoting Gallucci v. United States*, 41 Fed.Cl. at 644).

Even if the ADB had allowed the two girls to testify via telephone, over plaintiff's objections, Mr. Weaver's constitutional right to confrontation was, nonetheless, not violated. His attorney was freely permitted to cross-examine all of the witnesses called by the government, including Daughter 1 and daughter 2. The testimonial avenue by which the testimony came from, in the instant case, did not have a detrimental effect on the proceedings. The assertion that the girls were in someway "coached" by their father is baseless and without merit. The Board gave due deference to each piece of evidence, including each witness' testimony. Thus, plaintiff received the process he was entitled to under the Fifth Amendment to the Constitution.

### D. Substantial Evidence

Plaintiff next argues that the ADB wrongfully gave weight to evidence that was tainted and unreliable. Mr. Weaver contends that the ADB unduly considered the testimony of Daughter 1 and Daughter 2, because their natural father had the opportunity to manipulate their statements during the investigations and the ADB hearing. Plaintiff further challenges the trustworthiness of the two girls, as they had a history of lying. He basis specific emphasis on their conversation with their mother and the report prepared by Dr. Marilyn Thatcher, both of whom question the girls' credibility.

█ In reviewing BCNR decisions, plaintiffs must overcome the heavy burden of proving

"the Correction Board's decision was illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced..."

*See Krauss v. United States*, 40 Fed.Cl. 834, 838 (1998) (*quoting Sanders v. United States*, 219 Ct.Cl. 285, 298, 594 F.2d 804 (1979)). The province of this court is not to re-weigh the evidence originally considered by the administrating agency; rather, this court's task is to make sure the decision being reviewed was supported by substantial evidence. *See Milas*, 42 Fed.Cl. at 719 (*citing Black v. United States*, 28 Fed.Cl. 177, 183 (1993)). The Supreme Court has determined that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

█ In the instant case, the ADB properly considered all relevant evidence submitted in the proceeding. It was reasonable for the ADB to have determined that the two girls were credible based on their testimony, past interviews, and other evidence submitted. The ADB was in the best position to weigh the relevant evidence, and it was reasonable for the Board to arrive at such a conclusion. The Board, as with all public administrators, is presumed to have "discharge[d] their duties correctly, lawfully, and in good faith." *See Doe v. United States*, 132 F.3d 1430, 1434 (Fed.Cir.1997) (*quoting Sanders*, 219 Ct.Cl. 285, 594 F.2d at 813). This court, therefore, finds that there did exist substantial evidence for the justification of the ADB decision and BCNR's review.

### E. Arbitrary and Capricious Review

Plaintiff's final argument is that the BCNR acted arbitrarily and capriciously in reviewing Mr. Weaver's case. He contends that the Pers–661D memorandum had been wrongly considered by the BCNR and that not all facts had been presented to the Case Review Subcommittee. As previously discussed, plaintiff challenges the conclusions reached by the CRS, arguing that the subcommittee failed to consider allegedly exculpatory evidence. He asserts that the CRS failed to interview Mr. Weaver before arriving at its opinion and wrongly characterized Dr. Powell as lacking expertise in the field of child psychology.

This argument is also unavailing. Plaintiff has not shown that the evidence considered by the Board was arbitrary or capricious. He has failed to demonstrate that there existed exculpatory evidence that could have been considered by either the ADB or the BCNR. Moreover, the CRS was not the adjudicating agency in plaintiff's discharge; rather, it was an investigatory body. Therefore, the ADB was able to reasonably weigh the evidence presented by both plaintiff and the government. It is not the duty to this court to reweigh the credibility of Mr. Weaver's expert witness, nor the worth of the Pers–661D memorandum. *See Fluellen v. United States*, 44 Fed.Cl. 97, 101 (1999) (*citations omitted*).

Furthermore, the BCNR review of the ADB's decision was based upon substantial evidence. The BCNR properly reviewed all of the evidence submitted, carefully considering the written record and the testimony together. Therefore, this court finds that the ADB and the BCNR both acted in accordance to the law, arriving at well reasoned decisions.

### CONCLUSION

In the absence of any questions of material fact, this case is appropriate for disposition on the administrative record. Having found that none of the claims or arguments brought forth by plaintiff are valid, plaintiff's cross-motion for judgment on the administrative record (filed August 30, 1999) is hereby *DENIED* and Defendant's Motion for Judgment Upon the Administrative Record (filed July 20, 1999) is hereby *ALLOWED*.

IT IS **SO ORDERED.**